**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

LINDE INC. and LINCARE INC.,

                    Plaintiffs,

          v.

CRISPIN TEUFEL,

                    Defendant.

CIVIL ACTION
NO.: _____

## VERIFIED COMPLAINT

Plaintiffs Linde Inc. ("Linde") and Lincare Inc. ("Lincare") (collectively, "Plaintiffs" or the "Linde Group") file this Verified Complaint against Defendant Crispin Teufel ("Teufel" or "Defendant"). In support of this Verified Complaint, Plaintiffs state as follows:

## NATURE OF THE CASE

1.      This is an action for breach of contract, breach of duty of loyalty, and misappropriation of trade secrets for which Plaintiffs seek a temporary restraining order, preliminary and permanent injunctive relief, damages, and attorneys' fees.

2.      Lincare is a leading supplier of respiratory therapy and durable medical equipment and supplies to patients in the home and in alternate site care facilities. Together with its affiliates, Lincare provides these and other related services to approximately 1.8 million patients throughout the contiguous United States. Lincare and its affiliates also provide patients with products and services related to prothrombin time INR testing, remote patient monitoring, e-commerce, dental device distribution, enteral-related services, and other durable medical equipment and related supplies outside of the respiratory care space. Linde is a U.S. parent company of Lincare and its affiliates.

3.     For a combined decade Defendant served Lincare and its affiliates—first as a director and Chief Financial Officer and ultimately as Chief Executive Officer—before abruptly resigning recently to become the Chief Executive Officer of AdaptHealth Corp. ("AdaptHealth"), the largest direct competitor of Lincare.

4.     Since Defendant's resignation, Plaintiffs have uncovered evidence demonstrating that Defendant used Dropbox, a cloud-based file transfer software, to effectuate an extensive exfiltration of Plaintiffs' trade secrets, confidential information and data in the days immediately preceding his resignation, all for his own personal benefit and/or that of AdaptHealth.

5.     For example, just prior to Defendant's resignation, he archived large ".pst" files associated with his Lincare email account, uploaded those emails to a Dropbox account associated with his personal email address, shared them with an undisclosed computer, accessed them on that undisclosed computer, and then deleted the files from his computer. This action, standing alone, is cause for grave concern and supportive of emergency injunctive relief, but as fully established below, is just one example of Defendant's improper conduct and deception.

6.     Plaintiffs have also uncovered evidence since Defendant's resignation indicating that he engaged in extended discussions with AdaptHealth over multiple months regarding his new position as CEO and did so at a time when Lincare (with him as its CEO) engaged in the final negotiations over terms and conditions for a major contract with a Medicare Advantage HMO Provider. Although Lincare had been initially awarded a contract, Defendant ultimately recommended during these negotiations that Plaintiffs not pursue the contract. Thereafter, AdaptHealth pursued and successfully finalized the contract with the same provider.

7.     Plaintiffs have reason to believe that Defendant sabotaged Lincare's negotiations for this contract for his own personal benefit and/or that of AdaptHealth, and that he was motivated

to exfiltrate information from Plaintiffs, in part, to ensure that he retained possession of vast amounts of information related not only to Plaintiffs' business strategies surrounding this particular contract but also Plaintiffs' overall approaches and strategies for bidding on similar contracts.

8.      Defendant's discussions of employment with AdaptHealth and ultimate announcement of his resignation from Lincare also came shortly after Defendant (a German national who obtained U.S. permanent resident status almost 4 years ago and had been "temporarily" assigned to a role with Lincare in the U.S. for approximately 10 years) switched from his international assignment to Lincare from a Linde Group German affiliate to domestic employment with Linde and assignment as Lincare's Chief Executive Officer.

9.      This switch in status was first attempted a few years ago, but Defendant did not want to make the switch, which simply would have had him be treated like all other U.S. resident employees. It also meant Defendant would be forced to forego many benefits that were intended to incentivize foreign employees to accept temporary assignments in the U.S. In addition to exfiltrating the trade secrets, confidential information, and data to improperly set himself up to compete immediately against Lincare on AdaptHealth's behalf, Plaintiffs believe that Defendant's mass exfiltration of data also was undertaken as retaliation for this switch in Defendant's employment status.

10.      Ultimately, in the three days leading up to his resignation from Lincare, Defendant transferred more than thirteen gigabytes of information, including Plaintiffs' most sensitive documents and trade secrets, to his *personal* Dropbox account and thereafter deleted the documents from his Lincare-issued laptop, in an effort to try and hide his wrongdoing and prevent

Lincare from learning of this wrongdoing. Defendant also accessed Plaintiffs' information from undisclosed computer after uploading it to Dropbox.

11.     While Plaintiffs do not know when Defendant informally committed to his new position, it is clear that he was negotiating a term sheet with AdaptHealth at least by May 16, 2023, and signed a written employment agreement with AdaptHealth to formally accept his new role as its CEO on June 22, 2023--after engaging in his disloyal conduct and misappropriating troves of Plaintiffs' confidential information. Defendant has announced he will start in that position on September 1, 2023.

12.     With all of Plaintiffs' most recent financial, sales and marketing, business planning, prospective acquisition files, and payor information in hand, among other files and information, Defendant is now poised to use Plaintiffs' misappropriated information and trade secrets to give AdaptHealth an unfair competitive advantage over Plaintiffs, at Plaintiffs' expense, and for AdaptHealth's and Defendant's own benefit.

## PARTIES

13.     Lincare Inc. is a Delaware corporation with its principal place of business in Florida.

14.     Linde Inc. is a Delaware corporation with its principal place of business in Connecticut.

15.     Crispin Teufel is a citizen of Germany and permanent resident of the United States. Upon information and belief, he resides in Florida and is domiciled in Florida.

## JURISDICTION AND VENUE

16.     This Court has federal subject matter jurisdiction over Plaintiffs' claim under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1836 *et seq.*

17.     This Court has supplemental jurisdiction over Plaintiffs' state law claims, pursuant to 28 U.S.C. § 1367, because all claims are based on a common nucleus of operative fact and all claims form part of the same case or controversy.

18.     This Court has personal jurisdiction over Defendant because he contractually agreed to the exclusive jurisdiction of the United States District Court for the District of Connecticut sitting in Fairfield County, and because his intentional and unlawful conduct was and is calculated to harm Linde in Connecticut.

19.     Venue is proper within this judicial district because Defendant contractually agreed to personal jurisdiction and venue in Fairfield County, Connecticut, a place embraced by this district.

## ALLEGATIONS

**Defendant's Background at Linde and Promotion at Lincare**

20.     Defendant first began working for a predecessor of the Linde Group in Germany in October 2005.

21.     In March 2013, Defendant's employment was assigned by Linde AG – Lincare's then German parent company – to Lincare Holdings Inc., the U.S. parent of all Lincare entities, including Plaintiff Lincare Inc.

22.     In conjunction with his transfer to the United States, Linde AG assigned Defendant to work for Plaintiff Lincare as its Chief Financial Officer. As a foreign citizen being sent to the United States for what was intended to be a temporary work assignment, Defendant was provided certain generous benefits that are not typically afforded to American employees. Examples of these benefits include a base salary "mobility premium," a monthly housing and auto allowance, reimbursement for his children's private school tuition, company-paid travel benefits for annual

home leave, enhanced health and other insurance benefits, tax support and tax equalization benefits, and other benefits.

23.     Prior to his position with Lincare, Defendant had no professional experience in the home healthcare industry.

24.     Defendant gained all of his knowledge and know-how regarding the home healthcare industry from Lincare and its affiliates.

25.     In February 2015, Defendant was appointed a director of Lincare and its affiliates, and in March 2015 Defendant became Chief Financial Officer of Lincare and other Lincare affiliates, including Lincare Holdings Inc.

26.     In August 2017, Defendant was appointed Acting Chief Executive Officer of Lincare, while maintaining his Chief Financial Officer role.

27.     Effective January 2018, Defendant was confirmed as Chief Executive Officer of Lincare and other Lincare affiliates, including Lincare Holdings Inc.

28.     Defendant also continued to serve as a director of Lincare, Lincare Holdings, Inc., and was director or limited liability company manager for all but two Lincare affiliates.

29.     Defendant was also appointed to the Board of Directors of Bellerophon Therapeutics, Inc. ("Bellerophon"), filling a seat granted to Linde North America, Inc., a Linde affiliate, pursuant to a stockholders' agreement, as Linde North America, Inc.'s designee.

**Defendant's Role as Lincare's Chief Executive Officer**

30.     In his role as Lincare's CEO, Defendant was intimately involved in constructing and executing on Lincare's five-year strategic plan.

31.     Over the years, Defendant increasingly centralized Lincare's reporting structure under his direct control. At the time of his resignation, the heads of department for Billing, Finance,

Marketing, Process Improvement, and Mergers & Acquisitions, among others, all reported directly to him.

32.     As Lincare's CEO, Defendant also was privy to monthly presentations given by Linde's regional business units on the company-wide growth trajectory, budget assessment, and global business review for all of the Linde Group global businesses.

**Defendant's Participation in Long-Term Incentive Plans**

33.     As part of his generous compensation, Defendant participated in and received annual awards beginning in 2019 under the Linde Group's long-term incentive plans.

34.     Defendant was a participant in the Amended and Restated 2009 Linde Long Term Incentive Plan (the "2009 Plan").

35.     Under the 2009 Plan, Defendant was eligible for and did receive awards of nonqualified stock options, restricted stock units, and performance share units, in each of 2019, 2020 and 2021. These awards were subject to the terms of the 2009 Plan.

36.     Defendant also participated in and received awards of nonqualified stock options, restricted stock units, and performance share units beginning in 2022 pursuant to the 2021 Linde plc Long-Term Incentive Plan, effective as of July 26, 2021 (the "2021 Plan").

37.     Article 20.1 of the 2009 Plan, titled "Forfeiture Events and Clawback," provides that "[t]he Committee may specify in an Award Agreement that the Participant's rights, payments and benefits with respect to an Award shall be subject to reduction, cancellation, forfeiture, or recoupment upon the occurrence of certain specified events" and that such events may include "violation of material Company and/or Subsidiary policies, breach of noncompetition, confidentiality, or other restrictive covenants . . . or other conduct by the Participant that is detrimental to the business or reputation of the Company and/or its Subsidiaries."

38.     Article 20.1 of the 2021 Plan is materially identical to Article 20.1 of the 2009 Plan.

39.     For purposes of both the 2009 Plan and 2021 Plan, the "Committee" means the Human Capital Committee (or its predecessor) of Linde plc's board of directors.

40.     Linde plc is the publicly traded parent of both Linde and Lincare.

41.     The awards issued to Defendant under both the 2009 Plan and 2021 Plan were documented in annual award agreements that were presented to and accepted by Defendant. Each award agreement provides, in part:

> **Cancellation of Award**. Notwithstanding any other provision of this Award, the Committee may, in its sole discretion, cancel, rescind, suspend, withhold, or otherwise limit or restrict this Award, and/or recover any gains realized by the Participant in connection with this Award, in the event of any actions by the Participant are determined by the Committee to (a) constitute a conflict of interest with Linde, (b) be prejudicial to Linde's interests, or (c) violate any non-compete agreement or obligation of the Participant to Linde, any confidentiality agreement or obligation of the Participant to Linde, Linde's applicable policies, or the Participant's terms and conditions of employment.

42.     On July 24, 2023, the Committee approved the following resolution:

> RESOLVED, that the Committee has:  (a) determined that actions taken by Crispin Teufel, including but not limited to certain actions connected with his resignation from employment as the CEO of Lincare and his appointment to the substantially similar role of CEO of AdaptHealth, constitute a conflict of interest with the Company, are prejudicial to the Company's interests, and/or violate his ongoing obligations to the Company; and (b) authorized the Company to take any actions that it determines are reasonably necessary to cancel and rescind all awards previously made to Teufel under the Amended and Restated 2009 Linde Long Term Incentive Plan and the 2021 Linde plc Long Term Incentive Plan, and to recover from him any gains that he previously realized in connection with the exercise, vesting and/or settlement of any such award.

43.     Article 20.16 of the 2009 Plan provides that the laws of the State of Delaware will govern the terms of the 2009 Plan, and that recipients of an award under the 2009 Plan are deemed

to submit to the exclusive jurisdiction and venue of the federal or state courts of Connecticut, to resolve any and all issues that may arise out of or relate to the 2009 Plan.

44.     Article 20.15 of the 2021 Plan provided that its terms shall be governed by the laws of the State of Connecticut, and that recipients of an Award under the 2021 Plan are deemed to submit to the exclusive jurisdiction and venue of the federal or state courts in Fairfield County, Connecticut, to resolve any and all issues that may arise out of or relate to the 2021 Plan.

45.     Both Linde and Lincare are "Subsidiaries" of Linde plc as that term is defined in the 2009 Plan and 2021 Plan and may therefore enforce their rights under those Plans as against Defendant.

**Defendant's Memorandum of Employment Agreement**

46.     In 2020, the Linde Group began discussions with Defendant about terminating his foreign employment assignment and making him a U.S. employee. This change would mean the end of generous benefits that are intended for short-term assignments only. Although Defendant had at that point worked in the U.S. for almost a decade, obtained permanent resident status, and had no intention of returning to Germany, Defendant resisted the effort to be recharacterized as a U.S. employee.

47.     Finally, in February 2023, Linde began negotiating with Defendant a U.S. employment arrangement as a condition of his continued employment by Linde.

48.     Defendant was required, as a condition of his continued employment, to sign a Memorandum of Employment Agreement (the "MEA"), which by its terms was between Defendant and Linde as well as Linde's affiliates.

49.     Lincare is an "affiliate" of Linde as that term is used in the MEA.

50.    Defendant signed the MEA on May 22, 2023. At the time he signed the MEA, Defendant was already negotiating the terms of his employment with Lincare's direct competitor, AdaptHealth.

51.    Just after signing the MEA, and despite being in active negotiations with AdaptHealth to leave Lincare, Defendant scheduled and reserved an approximate two-week trip to Germany for December 2023. Defendant sought and received approval to be reimbursed for the expenses associated with that trip, which he calculated to be $27,751.80. Lincare reimbursed this amount to Defendant and despite leaving Lincare, Defendant has not re-paid Lincare for the costs advanced for this upcoming trip.

52.    The MEA Defendant signed in May 2023, by its terms, was retroactively effective as of the first day of his position as Chief Executive Officer in January 2018.[1]

53.    Section 3 of the MEA contains a confidentiality and non-disclosure provision that states, in pertinent part: "I agree to keep confidential and neither use nor disclose Confidential Information except as provided below or required in my employment with, or authorized in writing by, the Company, during employment and for so long thereafter as the information qualifies as Confidential Information."

54.    Section 11.3 of the MEA defines "Confidential Information" as:

> an item of information or compilation of information in any form (tangible or intangible) or format related to the Company's business and of value to it that I gain access to as an employee of the Company and that the Company has not made public or authorized public disclosure of, and that is not readily available to persons outside the Company through proper means who are not obligated to keep the information confidential. "Confidential Information"

---

[1] Prior to the effective date of the MEA, Defendant was subject to the terms of his employment agreement with Linde AG, Section 4 of which provided, in pertinent part: "The contracting partner is obligated to preserve in confidence all business operations of the Linde Group that are made known to him and all such business and trade secrets that are viewed, e.g., the standing and operations of the business, distribution, sales ratios, business transactions, calculations, fabrications methods and procedures, and so forth."

includes but is not limited to: (i) any technical or business information, know-how or trade secrets, patentable or not, in any form, including, but not limited to, data; diagrams; business, marketing or sales plans; notes; drawings; models; prototypes; specifications; manuals; memoranda; reports; internal customer lists, customer or vendor information; pricing or cost information; and computer programs, systems and applications, which are furnished to me by the Company or which I procure, prepare, or develop, alone or with others, in the course of employment; and (ii) Subject Developments as defined in Section 4.

55.     Section 6 of the MEA is a return provision that provides:

Accessing Company computers or data systems to compete or to prepare to compete is unauthorized access, strictly prohibited, and may lead to civil and/or criminal penalties. Upon termination of employment, I will promptly return all items of Company property, including all records of Confidential Information and Subject Developments, computers, tablets cell phones, keys, pass-cards, and similar items, to the Company, and allow Company access to any devices or accounts under my control where Confidential Information has been stored so that the Company can confirm its removal.

56.     Section 8 of the MEA provides that if Defendant "become[s] employed with an affiliate without signing a new agreement, the affiliate shall be treated the same as the original employer Company."

57.     Section 10 of the MEA states, in pertinent part:

If I breach or threaten to breach this Agreement, the Company may recover: (a) an order of specific performance or declaratory relief; (b) injunctive relief by temporary restraining order, temporary injunction, and/or permanent injunction; (c) damages; and (d) any other legal or equitable relief or remedy allowed by law. . . . If the Company seeks injunctive relief or damages it shall be deemed the prevailing party if any injunctive relief or damages are awarded to it irrespective of the denial of any other relief requested.

58.     In Section 14 of the MEA, Defendant agreed that the laws of the State of Delaware will govern the enforcement of the MEA, the construction of its terms, and the interpretation of the rights and duties of the parties created by the MEA.

59.     In Section 14 of the MEA, Defendant also agreed to the exclusive jurisdiction of the state or federal courts in Fairfield County, Connecticut for any claims arising from the MEA. He also agreed to submit to the personal jurisdiction of the state or federal courts in Fairfield County, Connecticut.

**Plaintiffs' Efforts to Protect Their Trade Secrets and Confidential Information**

60.     Plaintiffs have invested considerable time, expense, and resources in their business and healthcare professionals, including Defendant during his employment, so that they can perform their work for Plaintiffs competently and successfully.

61.     Plaintiffs maintain trade secrets that are valuable, confidential, and proprietary to Plaintiffs, and that are not generally known in the public domain, including business plans, competitive analyses, and detailed financial analyses and forecasts.

62.     Through their work, Plaintiffs' business executives, including Defendant, gain detailed and intimate knowledge of Plaintiffs' trade secrets and other confidential information.

63.     Plaintiffs' trade secrets, confidential information, and business relationships have significant economic value to them. Plaintiffs have a legitimate business interest in keeping such information confidential and not allowing their trade secrets and other confidential information to be disclosed to their competitors through any improper means.

64.     Plaintiffs' trade secrets and confidential information would be of significant economic value to their competitors.

65.     Consequently, Plaintiffs take the protection of its information very seriously and expend a considerable amount of time and money to keep their information secure. At all relevant times, Plaintiffs have taken extensive and reasonable steps to protect the confidentiality of their trade secrets and other confidential information. This includes:

(a)     Requiring an Access Badge or Keys to get into Lincare's headquarters, pharmacies, and billing offices;

(b)     Requiring all employees to sign confidentiality agreements;

(c)     Storing Plaintiffs' confidential information on secured and password-protected computer systems, which require multi-factor authentication and are accessible only to Plaintiffs' personnel;

(d)     Ensuring that employee account creation and permission levels are restricted to only the resources absolutely needed to perform each employee's job duties. When a user's role within the organization changes, those accounts and permission levels are changed/revoked to fit the new role and disabled when the user leaves the organization altogether.

(e)     Prohibiting company or business-related information from being sent, uploaded to, or received by, personal accounts;

(f)     Except related to devices for use in providing healthcare, disabling the ability to write to USB devices on all Lincare-issued computers; and

(g)     Requiring periodic data protection and device use training for all employees.

66.     Defendant acknowledged Lincare's employee handbook.

67.     Defendant completed the mandatory training on data protection and proper device use.

68.     Lincare issued Defendant a company laptop to use exclusively for work purposes.

69.     So that he could access work emails remotely, Lincare also allowed Defendant to install an email client on his personal iPhone, and Defendant accessed work emails on an iPad for which Lincare reimbursed Defendant.

**Defendant Breaches His Duty of Loyalty, and Steals Vast Amounts of Confidential Information, for AdaptHealth's Benefit**

70.     On February 2, 2023, a major health insurance provider (the "MA HMO Provider") awarded Lincare an exclusive Medicare Advantage HMO contract to serve as its durable medical equipment provider in approximately half of U.S. states ("Phase I states"), and announced a bid opportunity for the remaining states, along with the District of Columbia and Puerto Rico ("Phase II states").

71.     Lincare submitted a bid for the Phase II contract, and Defendant was intimately involved in developing Lincare's bid proposal.

72.     On February 28, 2023, the MA HMO Provider awarded Lincare an exclusive contract for the Phase II states.

73.     Unbeknownst to Plaintiffs at the time, Defendant had begun accessing websites concerning AdaptHealth as early as March 2023. On information and belief, Defendant's access of these websites were the first stages of him exploring the prospect of employment with AdaptHealth.

74.     AdaptHealth is Lincare's largest competitor in the home healthcare space. In recent years, AdaptHealth has increased its competition with Lincare for payor contracts and corporate acquisitions.

75.     AdaptHealth had also submitted a bid proposal for the MA HMO Provider's Phase II states.

76.     On April 24, 2023, Lincare representatives met onsite at the MA HMO Provider's offices to negotiate the terms and conditions of the Phase I and II contracts.

77.     Defendant took the lead in apprising Linde of the state of negotiations with the MA HMO Provider, to the substantial exclusion of other Lincare senior management, including

Lincare's Chief Operating Officer who would ordinarily participate in, and provide feedback to, Linde in such negotiations.

78.     Following the meeting, Plaintiffs' executives relied on Defendant to advise them on the prospect of negotiating a favorable set of terms with the MA HMO Provider.

79.     Without disclosing to Plaintiffs that he had begun discussions with AdaptHealth about future employment, Defendant told Plaintiffs that the negotiations with the MA HMO Provider were unlikely to have a favorable result and recommended that Lincare walk away from the contracts that it had been awarded.

80.     On April 28, 2023, Lincare notified the MA HMO Provider of its decision to withdraw from the bid process and to not enter into the exclusive agreements.

81.     On May 2, 2023, the MA HMO Provider announced that AdaptHealth had been awarded its exclusive contracts.

82.     Expressing surprise, one Lincare executive opined to Defendant that AdaptHealth would not be able to fulfill the requirements of the contracts with respect to the transitioning of the business. Defendant curiously responded, "We'll see." While Plaintiffs did not understand Defendant's comment at the time, they now believe that Defendant knew at the time he made the comment that he would be joining AdaptHealth. In doing so, he would be using Lincare's confidential information and/or trade secrets to direct and implement strategies at AdaptHealth to allow AdaptHealth to fulfill the newly-awarded contracts – once Lincare abruptly and unexpectedly dropped out of the running.

83.     On May 9, 2023, AdaptHealth announced that its chief executive officer would step down.

15

84.     According to company policy, Lincare employees (including Defendant) are permitted to create and use one third-party cloud storage account for work purposes, but the vendor that Lincare uses for these accounts is not Dropbox. Any exceptions to this policy must be specifically authorized by Lincare, and even if a Lincare employee were to be authorized to create a Dropbox account on a computer, the account must be registered to the employee's company email address. Absent authorization, employees are not permitted to access non-authorized cloud storage accounts from their company computer.

85.     On March 15, 2023 – after Defendant, on information and belief, had surreptitiously begun to explore potential employment with AdaptHealth—Defendant requested that his access to a Dropbox account be unblocked on his Lincare-issued laptop. Having open access rights, Defendant had prior to that time been permitted to use Dropbox, an exception to Lincare's general policy. At and near the time he requested his account be unblocked, Defendant had on numerous occasions unsuccessfully attempted to access the Dropbox account on his own.

86.     By March 23, 2023, and without knowledge of Defendant's intentions to resign from Lincare and exfiltrate Plaintiffs' trade secrets and confidential information in the process, Lincare reinstated Defendant's access to his Dropbox account, although Lincare was unaware that Defendant was utilizing a personal email account when using Dropbox.

87.     From March 23, 2023, until June 19, 2023, Defendant used his Dropbox account sparingly and intermittently and without any discernable pattern.

88.     However, during this time, Defendant's usage demonstrates that he was in active discussions with AdaptHealth regarding work there. On May 16, 2023, Defendant interacted with files titled "AdaptHealth – CT Term Sheet (CT Comments 5.16.23)" and "AdaptHealth – CT Term Sheet (AGG review 5.15.23)."

89.     Plaintiffs believe that these term sheets correlated with AdaptHealth's offer of employment to Defendant.

90.     Defendant's intermittent use of his personal Dropbox account changed dramatically on June 19, 2023.

91.     On June 19, 2023, at 12:36 PM ET, Defendant first inserted a SanDisk U3 Titanium USB device into his Lincare-issued laptop. Minutes later, Defendant removed the USB device from the Lincare-issued laptop. This appears to have been his first attempt to steal trade secrets and confidential information.

92.     Other than in connection with providing care to its patients, Lincare disables the ability to write to USB devices from all Lincare-issued laptops, and Defendant's was no exception.

93.     Minutes later on June 19th, at 1:28 PM ET, having been blocked by the system from using a USB drive, Defendant logged onto his personal Dropbox cloud-storage account and uploaded multiple files all at once in a "batch."

94.     Defendant's upload of information to Dropbox on June 19, 2023, was intentional and deliberate, as further evidenced by Defendant having needed to reset his Dropbox password minutes before uploading documents.

95.     On June 20, 2023, at 9:06 PM ET, Defendant uploaded another large amount, or batch, of data of unknown size (but believed to be well in excess eight gigabytes) from his Lincare-issued laptop to his personal Dropbox account (the "June 20 Files").

96.     The June 20 Files included vast amounts of Confidential Information, as well as documents that – separately and in combination – constitute Plaintiffs' trade secrets under federal and state law.

97. The June 20 Files included copies of the entire email inbox for Defendant's Lincare email account as well as emails regarding plans and analytics.

98. The June 20 Files also include, without limitation, the following:

(a) Lincare's Management folder (over 2.5 GB), which included files such as:

(i) 2023 Global Leadership Conference slide decks, setting forth, *inter alia*, Plaintiffs' parent company's overall business strategy, revenue forecasts, and key performance indicators;

(ii) Lincare's detailed methodology for competitive bidding on payor requests for proposals;

(iii) Detailed plans for improving Lincare's accounts receivable processes;

(iv) Years of compliance statistics;

(b) Lincare's HR Topics folder, which included documents setting forth Lincare employees' short-term incentive programs and bonus and commission structures, which are highly sensitive and critical to hiring and retaining personnel.

(c) Lincare's M&A folder, which contains subfolders for each of the entities Lincare is and has considered as potential corporate acquisition targets. These target subfolders include documents such as financial decks, offers, and financial modeling performed by Plaintiffs.

(d) The "Revenue Early Indication" spreadsheet for May 2023, with actual, budgeted, and forecasted revenue as of May 2023, and patient counts by product/service category.

(e) Multiple .pst files containing Outlook archives from his work email account.

99. Certain of the .pst files uploaded by Defendant on June 20, 2023, show evidence of having been previously shared with an undisclosed computer through Dropbox and accessed from that undisclosed computer.

100. Defendant's June 20, 2023, batch upload also included the materials regarding AdaptHealth that he had accessed previously on May 16, 2023.

101.    Defendant's June 20, 2023, batch upload was anomalous when compared to his history of usage of his Dropbox account.

102.    Defendant's company laptop, like all other Lincare laptops, synchronized to Plaintiffs' OneDrive server. There was therefore no need for mass synching to a private cloud-storage account for "backup" purposes.

103.    Defendant specifically set the personal Dropbox folder on his company laptop to *not* synchronize with Plaintiffs' OneDrive server.

104.    Also on June 20, Defendant told Lincare's COO that he would be traveling to the headquarters of Bellerophon to visit with that company's officers.

105.    Defendant's statement regarding his purported trip to visit Bellerophon was apparently a lie. Despite what he told Lincare's COO and Defendant's executive assistant, he did not in fact visit Bellerophon or any of its officers at that time, as confirmed by the Bellerophon CEO when Defendant's executive assistant tried to contact Defendant at Bellerophon.

106.    On June 22, 2023, Defendant uploaded the April 2023 Regional Billing and Collections Office Key Performance Indicator Management Report from his Lincare-issued laptop's Dropbox account to his personal Dropbox account.

107.    That same day, Defendant signed an employment agreement with AdaptHealth (the "AdaptHealth Agreement").

108.    Also that same day, before he disclosed to Lincare's General Counsel that he planned to resign, Defendant unexpectedly told the Lincare General Counsel that he wished to review certain Lincare employees' restrictive covenant agreements. Lincare's General Counsel furnished Defendant a folder, containing more than fifty of such agreements between Lincare or a Lincare affiliate and individuals who held or had held senior positions within the Lincare

organization, including, without limitation, Lincare's Chief Operating Officer, Chief Reimbursement Officer, Chief Compliance Officer, high-level operations and billing managers, Head of Business Process Improvement, and Head of Human Resources. Lincare's General Counsel furnished Defendant such folder to Defendant without awareness that Defendant had resigned and would not have done so had he been made aware of that fact.

109.   After being provided the employment agreements under these less-than-forthcoming circumstances, Defendant reviewed the agreements. Through counsel, Defendant later offered as an explanation that the employees had each asked him whether they were bound by non-competes. This explanation is not credible. Employees retain their own copies of executed agreements.

110.   On information and belief, Defendant traveled on June 22, 2023, to meet with AdaptHealth's officers and directors.

111.   On the morning of June 23, 2023, Defendant tendered his formal resignation to Linde's Chief Executive Officer.

112.   Then, at 1:37 PM ET that same day, Defendant uploaded another massive trove of data in his Lincare-issued laptop's Dropbox account to his personal Dropbox account (the "June 23 Files").

113.   The June 23 Files included, *inter alia*:

   (a)   Presentations submitted to Plaintiffs' parent company, through April 2023, showing each company's revenue by category, key performance indicators, an assessment of performance success and failures, overviews of strategic initiatives, revenue by payor, costs basis by quarter, other detailed financial metrics, and more.

   (b)   A spreadsheet containing Plaintiffs' detailed financial analysis of the prospective MA HMO Provider contract that Lincare had won before Defendant's unilateral decision to pull out and pave the way for AdaptHealth to secure the contract.

114.     Defendant's mass upload of Plaintiffs' files from his Lincare-issued laptop to his personal Dropbox cloud-storage account was a violation of company policy and was also anomalous when compared to his historical usage of his Dropbox account.

115.     Defendant did not have any legitimate business reason to access and transfer these files to his personal cloud-storage account his final days of employment.

116.     In the hands of a competitor, the files uploaded by Defendant could be used to, *inter alia*, severely undercut Plaintiffs' competitive bidding for payor contracts; place Plaintiffs at a competitive disadvantage in its corporate acquisition strategy; and undermine the competitive advantage Plaintiffs have built over many years through effective cost-cutting measures and market analysis.

117.     On June 26, 2023, Plaintiffs cut off Defendant's access to Plaintiffs' computer systems.

118.     On June 27, 2023, Defendant returned his Lincare-issued laptop to a Lincare employee. He did not return the iPad he used for work purposes and whose purchase was reimbursed by Lincare.

119.     Between June 23, 2023, and June 27, 2023, it appears that Defendant deleted virtually all of the Confidential Information that had been in the Dropbox folder on his Lincare-issued laptop, leaving only a selection of personal or innocuous files.

**Defendant Refuses Plaintiffs' Request for Compliance with Contractual Obligations**

120.     On July 7, 2023, Plaintiffs, through counsel, sent Defendant a letter requesting that he comply with his obligation under Section 6 of the MEA to provide Plaintiffs with access to any device or personal cell phone on which he stored Confidential Information.

121.    In their July 7 letter, Plaintiffs also requested that Defendant provide a complete description of the role and duties he would be assuming at AdaptHealth. Plaintiffs made this request to assess the risk of, among other things, Defendant's inevitable use or disclosure of Plaintiffs' Confidential Information in his role at AdaptHealth.

122.    Finally, Plaintiffs reminded Defendant of his obligation to preserve and return any material in his possession, custody or control that relate in any way to any of Plaintiffs' businesses or his employment with Plaintiffs.

123.    On July 11, 2023, Defendant responded, through counsel, in a letter stating, *inter alia*, that he "searched his electronic records and his personal devices and deleted any materials he could find related to Linde" and that he "also searched for any Lincare files left on his personal devices from downloads through OneDrive, Files or DropBox and removed those, too." There was no mention of the previous theft of trade secrets by Defendant.

124.    In response to Plaintiffs' request for a description of Defendant's duties at AdaptHealth, Defendant's July 11 letter merely referred Plaintiffs to Defendant's publicly filed employment agreement with AdaptHealth, which provides the following non-specific statement of duties:

> During the Term, Executive shall be employed and serve as the Chief Executive Officer of the Company (together with such other position or positions consistent with Executive's title as the Board shall specify from time to time) and shall have such duties and responsibilities commensurate with such title.

125.    Defendant was contractually obligated to *return* to Plaintiffs all of their records that existed on his devices or his accounts. Instead, he purports to have deleted them.

126.    Relatedly, despite Defendant's obligation to preserve any records in his possession, custody, or control that may be relevant to the claims raised in Plaintiffs' July 7 letter, his July 11

letter makes clear that he has engaged in spoliation. Given his deceptive conduct, it is not clear and likely that Defendant still has Plaintiffs' information in his possession, custody and/or control and has not returned it.

127.    Without copies of all the files in Plaintiffs' possession at the time of his separation from employment or a complete forensic inspection, Plaintiffs are unable to assess the full inventory of documents in his possession.

128.    Plaintiffs' July 11 letter states that, upon Defendant's return from a European vacation "he will be glad to arrange an in-person meeting with a Linde representative to verify his removal of Linde related materials from his phone and iPad."

129.    Defendant's proposed device inspection is insufficient to meet his obligations under Section 6 of the MEA, and conspicuously fails to agree to an inspection of the Dropbox account that he used to exfiltrate Plaintiffs' data or other unidentified personal devices that contained Plaintiffs' information as indicated by the forensic review.

## <u>COUNT I</u>

### **FEDERAL DEFEND TRADE SECRETS ACT**
(Defendant Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1836 et seq.)

130.    Plaintiffs repeat and re-allege each and every allegation stated in the preceding paragraphs of the Complaint as if fully set forth herein.

131.    The files stolen by Defendant from June 20 through June 23, 2023—examples of which are highlighted above in paragraphs 98 and 113—constitute trade secrets within the meaning of the DTSA because:

> (a)    Such information is not known outside Plaintiffs' businesses and is known within Plaintiffs' businesses only on a need-to-know basis.

> (b)    Plaintiffs take reasonable measures to protect the secrecy of this information. This information is highly valuable and derives its value from

being secret. Plaintiffs expend considerable effort to generate this information.

(c)     This information is very difficult – if not impossible – for others to properly acquire or duplicate without Plaintiffs' authorization and is not readily ascertainable.

(d)     This information would be highly valuable to Plaintiffs' competitors.

132.     Defendant used improper means to misappropriate this information in that he transferred it to his personal cloud-storage account in his final days of employment – in violation of company policy – without any legitimate business reason for doing so.

133.     On information and belief, Defendant misappropriated Plaintiffs' trade secrets so that he could further copy them and use them in his role as Chief Executive Officer at AdaptHealth.

134.     On information and belief, Defendant has used or will inevitably use such information to Plaintiffs' detriment since his departure.

135.     Plaintiffs have suffered irreparable harm as a result of such conduct, will continue to suffer irreparable harm in the absence of an injunction, and has no adequate remedy at law without an injunction.

136.     As a direct and proximate result of Defendant's conduct, Plaintiffs are entitled to actual damages in an amount to be determined at trial. Defendant's acts and conduct were willful and malicious, justifying an award of exemplary damages and attorneys' fees.

## COUNT II

### BREACH OF CONTRACT
(Delaware common law)

137.     Plaintiffs repeat and re-allege each and every allegation stated in the preceding paragraphs of the Complaint as if fully set forth herein.

138.    Defendant's MEA is a valid contract supported by adequate consideration, and Plaintiffs have the authority to enforce it.

139.    Plaintiffs have performed all of their obligations under the MEA and all other understandings with Defendant.

140.    Defendant breached Section 3 of the MEA by, upon information and belief, by taking, disclosing and using Plaintiff's Confidential Information (as defined in the MEA) outside the course of his employment with Plaintiffs, including but not limited to Plaintiffs' business information, know-how, marketing and sales plans, memoranda, reports, and pricing or cost information, and he will inevitably continue to disclose this Confidential Information in his role as chief executive officer of AdaptHealth.

141.    Defendant breached Section 6 of the MEA by accessing a Company computer and data systems in order to compete or prepare to compete with Plaintiffs.

142.    Defendant also breached Section 6 of the MEA by failing to return the company-reimbursed iPad that he used for work purposes and failing to provide Plaintiffs with immediate access to the devices and accounts under his control where Confidential Information had been stored so that Plaintiffs could confirm its removal.

143.    Defendant continues to violate his contractual obligations and will continue to violate these obligations in the future.

144.    Because of the foregoing, Plaintiffs have suffered and will continue to suffer irreparable harm for which they lack an adequate remedy at law, as well as present and future economic harm which is unascertainable at the present time.

145.    As result of Defendant's breach of Sections 3 and 6 of the MEA, Plaintiffs are entitled to a recoupment of the proceeds of awards granted to him under the 2009 Plan and 2021 Plan that have vested and/or been exercised by Defendant.

## COUNT III

### MISAPPROPRIATION OF TRADE SECRETS

(Florida Uniform Trade Secrets Act ("FUTSA"), Fla. Stat. § 688.001 et seq.)

146.    Plaintiffs repeat and re-allege each and every allegation stated in the preceding paragraphs of the Complaint as if fully set forth herein.

147.    The files exfiltrated by Defendant from June 20 through June 23, 2023, constitute trade secrets within the meaning of the FUTSA because:

(a)    Such information is not known outside Plaintiffs' businesses and is known within Plaintiffs' businesses only on a need-to-know basis.

(b)    Plaintiffs take measures reasonable under the circumstances to protect the secrecy of this information. This information is highly valuable and derives its value from being secret. Plaintiffs expend considerable effort to generate this information.

(c)    This information is very difficult – if not impossible – for others to properly acquire or duplicate without Plaintiffs' authorization and is not readily ascertainable.

(d)    This information would be highly valuable to Plaintiffs' competitors.

148.    Defendant used improper means to misappropriate this information in that he transferred it to his personal cloud-storage account in his final days of employment – in violation of company policy – without any legitimate business reason for doing so.

149.    On information and belief, Defendant misappropriated Plaintiffs' trade secrets so that he could further copy them and use them in his role as Chief Executive Officer at AdaptHealth.

150.    On information and belief, Defendant has used or will inevitably use such information to Plaintiffs' detriment since his departure.

151.    Plaintiffs have suffered irreparable harm as a result of such conduct, will continue to suffer irreparable harm in the absence of an injunction, and has no adequate remedy at law without an injunction.

152.    As a direct and proximate result of Defendant's conduct, Plaintiffs are entitled to actual damages in an amount to be determined at trial. Defendant's acts and conduct were willful and malicious, justifying an award of exemplary damages and attorneys' fees.

## COUNT IV – BREACH OF DUTY OF LOYALTY
### (Delaware common law)

153.    Plaintiffs repeat and re-allege each and every allegation stated in the preceding paragraphs of the Complaint as if fully set forth herein.

154.    As an executive officer, director, and employee of Plaintiffs, Defendant owed Plaintiffs a duty of loyalty.

155.    As a result, Defendant was obligated to act with the utmost good faith and in Plaintiffs' best interests.

156.    Plaintiffs were entitled to place their trust and confidence in Defendant and was entitled to expect Defendant to act with the utmost good faith toward Plaintiffs in carrying out their business.

157.    Plaintiffs relied on Defendant's loyalty and integrity and faithful performance of his job duties and responsibilities.

158.    Defendant's unfaithful conduct – including but not limited to his sabotage of Lincare's exclusive deal with the MA HMO Provider for AdaptHealth's benefit – constitutes a knowing and willful breach of his duty of loyalty toward Plaintiffs.

159.     This claim is not predicated on the misappropriation or theft of any confidential, proprietary and/or trade secret information belonging to Plaintiffs. Rather, it is predicated on Defendant's deceit and breach of his duties of loyalty.

160.     As a direct and proximate result of Defendant's breach of his fiduciary duties, Plaintiffs have been and are being harmed and face irreparable injury.

161.     Defendant is entitled to damages, in an amount to be determined at trial, as well as disgorgement by Defendant of the salary, benefits (including travel reimbursement) and other forms of remuneration paid to him during the time that he was, in secret, being disloyal to Plaintiffs, and all profits he and/or his new employer received as a result of his disloyalty, in an amount to be determined at trial.   Plaintiffs are further entitled to injunctive relief against Defendant to remedy his past improper conduct and prevent further irreparable harm to Plaintiffs.

162.     Defendant's actions were done with malice, fraud, oppression, and reckless disregard of Plaintiff's above-described rights. Therefore, Plaintiffs seek and are entitled to recover punitive damages from Defendant.

## COUNT V – MISAPPROPRIATON OF CORPORATE OPPORTUNITY
(Delaware common law)

163.     Plaintiffs repeat and re-allege each and every allegation stated in the preceding paragraphs of the Complaint as if fully set forth herein.

164.     Plaintiffs were financially able to exploit the opportunity presented by the exclusive contracts with the MA HMO Provider, for which they had successfully bid.

165.     The opportunity was within Plaintiffs' lines of business, namely the supply and servicing of durable medical equipment.

166.     Plaintiffs had an interest or expectancy in the opportunity, and indeed had actually been awarded the contracts.

167.     Unbeknownst to Plaintiffs, Defendant took the opportunity for himself, and for his future employer, in his capacity as the incoming chief executive officer of AdaptHealth.

168.     Through Defendant's misappropriation of the opportunity, Defendant placed himself in a position inimical to his duties to Plaintiffs.

169.     As a direct and proximate result of Defendant's conduct, Plaintiffs are entitled to actual damages in an amount to be determined at trial. Defendant's acts and conduct were willful and malicious, justifying an award of punitive damages and attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

1.     Preliminary and permanent injunctive relief:

    (a)     enjoining Defendant, as well as any third party to which Defendant disclosed Plaintiffs' Confidential Information or trade secrets from using or disclosing same;

    (b)     ordering Defendant to submit any computing device (including cellular phones), email or cloud-storage accounts, and external media storage devices in his custody, possession, or control (including any such devices or accounts used by him or his household members personally) for independent forensic inspection and remediation to purge any copies of Plaintiffs' Confidential Information or trade secrets found thereon;

    (c)     enjoining Defendant from performing any services for AdaptHealth Corp. or any of its affiliates (collectively, "AdaptHealth") or any other entity offering services competitive to Plaintiffs' businesses until such time as Defendant has fully satisfied the terms set forth above; and

    (d)     enjoining Defendant from performing any services for AdaptHealth in any line of business that is competitive with Plaintiffs' lines of business, including any services pertaining to respiratory health, for such period of time as the Court finds necessary to prevent irreparable harm resulting from Defendant's misappropriation of trade secrets and breach of contract.

2.     Compensatory damages, in an amount to be determined at trial;

3.      Disgorgement of past compensation in all forms including reimbursement for travel and other purported business expenses during Defendant's period of disloyalty, in an amount to be determined at trial;

4.      Recoupment of all gains received by Defendant in connection with each Award made to Defendant under the 2009 Plan and 2021 Plan;

5.      Punitive or exemplary damages pursuant to 18 U.S. Code § 1836, Florida Uniform Trade Secrets Act, Fla. Stat. § 688.004, and Delaware common law;

6.      Plaintiffs' reasonable attorneys' fees and costs;

7.      A jury trial on all claims so triable;

8.      Pre-judgment interest; and

9.      Such other and further relief, legal and equitable, that this Court deems just and proper.

Dated at New Haven, Connecticut on August 14, 2023.

Respectfully submitted,

/s/ *Lori B. Alexander*
Lori B. Alexander
LITTLER MENDELSON, P.C.
One Century Tower
265 Church Street, Suite 300
New Haven, CT 06510
Telephone: 203.974.8700
Facsimile: 203.974.8799
lalexander@littler.com

Miguel A. Lopez (motion for admission pro hac vice forthcoming)
LITTLER MENDELSON, P.C.
900 Third Avenue, 8th Fl.
New York, NY 10022
Telephone: 212.583.9600

Facsimile: 212.832-2719
malopez@littler.com

James M. Witz (motion for admission pro hac
vice forthcoming)
Richard T. Kienzler (motion for admission pro
hac vice forthcoming)
LITTLER MENDELSON, P.C.
321 North Clark Street
Suite 1100
Chicago, IL 60654
jwitz@littler.com
rkienzler@littler.com

## VERIFICATION

I, Greg McCarthy, Chief Operating Officer, am the authorized representative of Linde Inc. and Lincare, Inc. for purposes of verifying the foregoing Complaint. I have personal knowledge of the matters set forth in the Complaint or the information contained therein has been collected and made available to me by counsel and employees of Linde Inc. or Lincare, Inc. I affirm that the factual information and statements made therein are true and correct to the best of my knowledge and belief.

_____
Greg McCarthy

STATE OF FLORIDA        )
                          ) ss.:
COUNTY OF _PINELLAS_    )

Personally appeared, Greg McCarthy before me and subscribed and swore to the foregoing on this _14_ day of August 2023.

MARGARET M. NORCROSS
Commission # HH 227940
Expires May 1, 2026

_____
Notary Public
My Commission Expires: _5/1/2026_